Case No. 1:05-CV-00988 (RMC)

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**CONSEIL ALAIN ABOUDARAM, S.A.,**
**Appellant,**

**- against -**

**JACQUES DE GROOTE,**
**Appellee.**

**ON APPEAL FROM**
**THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLUMBIA**
*In re Jacques de Groote* (Chapter 11 Case No. 02-0981)

# BRIEF FOR APPELLANT

**James L. Marketos, Esq.**
**Alexander C. Vincent, Esq.**
**Berliner, Corcoran & Rowe, L.L.P.**
**1101 17th Street, N.W., Suite 1100**
**Washington, D.C. 20036-4798**
**Telephone: (202) 293-5555**
**Fax: (202) 293-9035**
**E-mail:      jlm@bcr-dc.com**
**           acv@bcr-dc.com**

**Attorneys for Appellant**
**Conseil Alain Aboudaram, S.A.**

**June 27, 2005**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

STATEMENT OF BASIS FOR APPELLATE JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . 1

STANDARD OF APPELLATE REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ISSUE PRESENTED FOR REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

A.     INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

B.     THE ORIGINS OF THE CAASA-DE GROOTE DISPUTE . . . . . . . . . . . . . . . . . . . . . 7

C.     THE DISTRICT COURT PLEADINGS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

D.     THE PRE-TRIAL RECORD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

E.     THE DISTRICT COURT TRIAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

F.     POST-TRIAL EVENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

I.     THE BANKRUPTCY COURT ERRED IN DEEMING CAASA's ALTERNATIVE
       CLAIM THEORIES TO BE PART OF THE SAME CAUSE OF ACTION AS CAASA's
       PROMISSORY NOTES CLAIM. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

II.    THE BANKRUPTCY COURT ERRED IN CONCLUDING THAT CAASA COULD
       HAVE ANTICIPATED de GROOTE's NEW INTRINSIC ISSUE. . . . . . . . . . . . . . . . . 30

III.   THE BANKRUPTCY COURT ERRED IN DECLINING TO APPLY THE
       *THROCKMORTON* EXCEPTION FOR FRAUD AND MISCONDUCT IN
       LITIGATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

i

IV.    THE BANKRUPTCY COURT ERRED IN DETERMINING THAT CAASA HAD A FULL AND FAIR OPPORTUNITY IN THE DISTRICT COURT TO LITIGATE WHETHER IT RECEIVED CONSTITUTIONALLY ADEQUATE NOTICE OF de GROOTE's NEW ISSUE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

V.     THE BANKRUPTCY COURT ERRONEOUSLY REJECTED THE PERSUASIVE LOGIC OF ESTOPPEL AUTHORITIES FROM OTHER JURISDICTIONS. . . . . . . . 43

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

# TABLE OF AUTHORITIES

## CASES

*Apotex, Inc. v. Food & Drug Admin.*, 393 F.3d 210 (D.C. Cir 2004). . . . . . . . . . . . . . . . 1, 24, 43

*Athridge v. Aetna Cas. & Sur. Co.*, 351 F.3d 1166 (D.C. Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . 1

*Bolte v. AITS, Inc.*, 587 P.2d 810 (Hawaii 1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Browning v. Levy*, 283 F.3d 761 (6th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*City of New York v. New York, New Haven & Hartford R.R. Co.*, 344 U.S. 293 (1953). . . . . . . 41

*Doe v. Allied Signal, Inc.*, 895 F.2d 908 (7th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Drake v. Federal Aviation Admin.*, 291 F.3d 59 (D.C. Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . 43

*Federated Dep't Stores v. Moitie*, 452 U.S. 394 (1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Harnett v. Billman*, 800 F.2d 1308 (4th Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 44

*Hopewell Township Citizens I-95 Comm. v. Volpe*, 482 F.2d 376 (3rd Cir. 1973). . . . . . . . . . . 37

*Howe v. Vaughn (In re Howe)*, 913 F.2d 1138 (5th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . 31, 32

*In re Bank of New England Corp.*, 218 B.R. 643 (Bankr. 1st Cir. 1998). . . . . . . . . . . . . . . . . . . . 1

*In re Lake*, 202 B.R. 751 (Bankr. 9th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*In re St. Charles Preservation Investors, Ltd.*, 112 B.R. 469 (D.D.C. 1990). . . . . . . . . . . . . . . . . 1

*In re Walsh Trucking Co.*, 838 F.2d 698 (3rd Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Lunsford v. Kosanke*, 295 P.2d 432 (Cal. Ct. App. 1956). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*McCarty v. First of Georgia Ins. Co.*, 713 F.2d 609 (10th Cir. 1983). . . . . . . . . . . . . . . . . . . . . 36

*Nat'l Ass'n of Life Underwriters, Inc. v. Comm'r*, 30 F.3d 1526 (D.C. Cir. 1994). . . . . . . . . . 42

*Sawyer v. First City Fin. Corp.*, 177 Cal. Rptr. 398 (Ct. App. 1981). . . . . . . . . . . . . . . . . . . 43, 44

*Smith v. United States*, 408 F.2d 448 (7th Cir. 1968). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 41

*U.S. Industries, Inc. v. Blake Construction Co., Inc.*, 765 F.2d 195 (D.C. Cir. 1985). . . . . . 25, 34

*United Bank & Trust Co. v. Hunt*, 34 P.2d 1001 (Cal. 1934). . . . . . . . . . . . . . . . . . . . . . . . . . 44

*United States v. Throckmorton*, 98 U.S. 61 (1878). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

## RULES OF COURT

Fed. R. Civ. P. 4. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Fed. R. Civ. P. 50(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Fed. R. Civ. P. 50(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Fed. R. Civ. P. 59(e). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Fed. R. Civ. P. 59(e). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Fed. R. Civ. P. 60(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Fed. R. Civ. P. 8. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

## STATUTES

28 U.S.C. § 158(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 158(a)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

## TREATISES

18 CHARLES A. WRIGHT, ET AL., FEDERAL PRACTICE AND PROCEDURE § 4415 (2nd ed. 2002).
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 37

18 CHARLES A. WRIGHT, ET AL., FEDERAL PRACTICE AND PROCEDURE § 4407 (2nd ed. 2002). . . . . 26

5 CHARLES A. WRIGHT AND ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1261 (2nd ed. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

RESTATEMENT (SECOND) OF JUDGMENTS § 26 cmt. j (1982). . . . . . . . . . . . . . . . . . . . . . . 35, 44

RESTATEMENT (SECOND) OF JUDGMENTS § 24 cmt. a (1982). . . . . . . . . . . . . . . . . . . . . . . . 28

RESTATEMENT (SECOND) OF JUDGMENTS § 24(2) (1982). . . . . . . . . . . . . . . . . . . . . . . . . . 25, 27

## STATEMENT OF BASIS FOR APPELLATE JURISDICTION

The Disallowance Order granted de Groote's motion for summary judgment, sustained de Groote's Objection to CAASA's original and amended proofs of claim, and completely disallowed CAASA's claim. The Disallowance Order thereby conclusively determined a discrete dispute (*i.e.*, whether CAASA is a creditor of de Groote) within de Groote's bankruptcy case. *See In re Bank of New England Corp.*, 218 B.R. 643, 647 (Bankr. 1st Cir. 1998); *In re St. Charles Preservation Investors, Ltd.*, 112 B.R. 469, 472 (D.D.C.) ("An order which conclusively determines a separable dispute over a creditor's claim or priority is appealable" as a final order under 28 U.S.C. § 158(a)), *appeal dismissed on other grounds*, 916 F.2d 727 (D.C. Cir. 1990); *In re Walsh Trucking Co.*, 838 F.2d 698, 701 (3rd Cir. 1988) (order expunging creditor's claim for failure of proof immediately appealable). The Disallowance Order is therefore a final order over which this Court has appellate jurisdiction pursuant to 28 U.S.C. § 158(a)(1).

## STANDARD OF APPELLATE REVIEW

Because the "preclusive effect of federal court litigation is a question of federal law," *Athridge v. Aetna Cas. & Sur. Co.*, 351 F.3d 1166, 1170 (D.C. Cir. 2003), which was determined on a motion for summary judgment, it is reviewed *de novo*. *See Apotex, Inc. v. Food & Drug Admin.*, 393 F.3d 210, 217 (D.C. Cir 2004).

## ISSUE PRESENTED FOR REVIEW

Whether the bankruptcy court erred in determining that CAASA's amended proof

of claim is barred by *res judicata.*

## STATEMENT OF THE CASE

This appeal arises out of de Groote's filing in this Court of a voluntary petition under Chapter 11 of the Bankruptcy Code on May 14, 2002 ("Bankruptcy Case"), the day before CAASA was to foreclose on de Groote's townhouse at 1675 34th Street, N.W., Washington, D.C. ("Georgetown Townhouse").[1]  CAASA was by far de Groote's largest and (except for the first mortgagee on the Georgetown Townhouse) his oldest secured creditor.  De Groote named CAASA first on his list of 20 largest creditors (Bankr. Docket # 1).  De Groote's Schedule D, filed June 17, 2002 (Bankr. Docket # 11), listed CAASA's claim as disputed in the amount of $1,146,756.27 and partially secured by second and third deeds of trust against the Georgetown Townhouse.  De Groote's bankruptcy schedules made no mention of a debt owed personally to Alain Aboudaram, CAASA's principal owner.

In all, de Groote's Bankruptcy Case involves only eight creditors (including CAASA).  CAASA is the only creditor that has taken an active role in the Bankruptcy Case, which has proceeded as a bilateral contest between de Groote and CAASA, essentially an extension of the pre-existing District Court Case (*see* Statement of Facts below).

On October 2, 2002, CAASA filed its original proof of claim in the Bankruptcy

---

[1]     When de Groote filed his bankruptcy petition, the related district court action, *Conseil Alain Aboudaram, S.A. v. de Groote*, Case No. 1:01-CV-00006 (JDB) (D.D.C. filed Jan. 3, 2001) ("District Court Case") had already been underway for a year and a half (*see* Statement of Facts).  By order of August 17, 2002, the Bankruptcy Court lifted the automatic stay to allow the District Court Case to continue during de Groote's bankruptcy, thereby allowing CAASA's promissory note enforcement claim and de Groote's numerous counterclaims and defenses to continue to be litigated together.

Case in the amount of $1,385,093.17. CAASA identified the claim as being for money lent and as being secured by the Georgetown Townhouse pursuant to second and third deeds of trust (Bankr. Claim Reg., Claim # 5). CAASA's proof of claim attached supporting documentation, including copies of the two demand promissory notes on which the claim was based (at the time) and the two deeds of trust securing de Groote's obligation to repay the notes.

Nearly two years later, on August 27, 2004, after trial in the related District Court Case, CAASA filed its amended proof of claim in the amount of $1,374,742.61 ($10,350.56 less than CAASA's original proof of claim) based on updated interest calculations proved in the District Court Case (Bankr. Claim Reg., Claim # 9).[2] CAASA's amended proof of claim attached documentation supporting new claim theories not advanced when CAASA submitted its original proof of claim.[3]

On September 7, 2004, de Groote filed an Objection to CAASA's original and amended proofs of claim (Bankr. Docket # 207). His sole basis for objection was that the judgment adverse to CAASA in the related District Court Case (see Statement of Facts) was *res judicata* as to CAASA's bankruptcy claim, which should therefore be completely disallowed.

On October 7, 2004, CAASA filed an opposition to de Groote's Objection (Bankr. Docket # 218). CAASA's opposition explained that CAASA's amended proof of claim and supporting documentation were based on theories of recovery against de Groote that had not been

---

[2]    A typographical error in CAASA's amended proof of claim resulted in a misstatement of the amount of the amended claim. The error was corrected in CAASA's Opposition to Debtor's Objection to Proofs of Claim (Bankr. Docket # 218).

[3]    Hereinafter, and unless otherwise stated, all exhibit references, denominated "Ex." will be to the exhibits to CAASA's amended proof of claim. All exhibits denominated "Pl.'s Ex." refer to CAASA's exhibits admitted into evidence at the trial of the District Court Case.

litigated in the District Court Case: (1) express written contract (including third-party

beneficiary contract); (2) express oral contract; (3) implied-in-fact contract; (4) implied-in-law

contract (a/k/a assumpsit for money had and received, money lent, quasi contract, or unjust

enrichment); (5) account stated; (6) promissory estoppel; and (7) equitable and judicial estoppel

("Alternative Claim Theories").

       On November 12, 2004, de Groote moved for summary judgment on his

Objection to CAASA's proofs of claim (Bankr. Docket # 234), repeating his argument that

CAASA's claim should be disallowed because the judgment for de Groote in the District Court

Action was *res judicata* as to all claim theories. On December 3, 2004, CAASA filed an

opposition to de Groote's motion for summary judgment (Bankr. Docket # 247), acknowledging

that the judgment adverse to CAASA in the District Court Case was *res judicata* as to CAASA's

claim for enforcement of the promissory notes (the only claim actually litigated in the District

Court Case), but disputing that the judgment was *res judicata* as to CAASA's Alternative Claim

Theories and asserting a number of judicially recognized exceptions to the application of *res

judicata* to CAASA's Amended Proof of Claim.

       By order dated February 23, 2005 (Bankr. Docket # 308) ("Disallowance Order"),

accompanied by a 15-page Decision Re Motion for Summary Judgment (Bankr. Docket # 307)

("Disallowance Decision"), the Bankruptcy Court granted de Groote's motion for summary

judgment and completely disallowed CAASA's claim. The decision was based on the *res

judicata* effect of the judgment adverse to CAASA in the District Court Case and the supposition

that CAASA had already litigated all claim theories (or could have litigated them) in the District

Court Case. The Bankruptcy Court also declined to apply any of the judicially recognized

4

exceptions to the *res judicata* doctrine.

The very next day, February 24, 2005, de Groote filed a proposed disclosure statement and plan of reorganization ("Plan") in his Chapter 11 Bankruptcy Case (Bankr. Docket #s 309 & 310). De Groote's Plan made no mention of CAASA's claim or of the pendency of CAASA's appeal to the D.C. Circuit from the adverse judgment in the District Court Case.

On March 7, 2005, CAASA moved to amend the Disallowance Order (Bankr. Docket # 326). CAASA's proposed amendment would have added language depriving the Disallowance Order of *res judicata* effect pending the outcome of CAASA's pending D.C. Circuit Appeal (see below). De Groote opposed the motion on March 21, 2005 (Bankr. Docket # 337).

By order dated March 24, 2005 (Bankr. Docket # 344), the Bankruptcy Court denied CAASA's motion to amend with the following proviso: "The summary judgment order may be vacated on a Rule 60 motion if the court of appeals reverses the related district court judgment, and this order does not bar staying transmission of an appeal of the summary judgment order." On April 1, 2005, CAASA noticed the instant appeal of the Disallowance Order and of the order denying CAASA's motion to amend (Bankr. Docket # 352) ("Bankruptcy Appeal").

On May 18, 2005, the Bankruptcy Court approved an order, mutually agreeable to both CAASA and de Groote, conditionally confirming de Groote's Plan pending further Bankruptcy Court order following the final determination of this Bankruptcy Appeal and the currently pending D.C. Circuit Appeal (Bankr. Docket # 404) ("Conditional Confirmation Order"). Pending the resolution of this Bankruptcy Appeal and the D.C. Circuit Appeal, the Conditional Confirmation Order also delays: (1) the re-vesting of estate property in de Groote;

(2) the release of all creditors' claims to and interests in property affected by the Plan; and (3) de Groote's discharge. The Conditional Confirmation Order also expressly disclaims any mooting effect on either this Bankruptcy Appeal or the D.C. Circuit Appeal.

This Bankruptcy Appeal was docketed May 17, 2005. On May 26, 2005, CAASA filed a Consent Motion to Extend Bankruptcy Appellate Briefing Deadlines (Bankr. Appeal Docket # 3), by which CAASA's principal Bankruptcy Appeal brief would be due on or before June 27, 2005, and de Groote's principal Bankruptcy Appeal brief would be due on or before July 18, 2005.

## STATEMENT OF FACTS

### A.    INTRODUCTION

The facts relevant to this Bankruptcy Appeal arise from events in (and even before) the related District Court Case, which CAASA commenced January 3, 2001, a year and a half prior to the Bankruptcy Case.[4] A detailed understanding of these events is critical to determining whether the Bankruptcy Court properly granted summary judgment to de Groote on *res judicata* grounds.

One fact is of overriding importance for this appeal: De Groote obtained judgment against CAASA in the District Court Case on the basis of a fact issue he never

---

[4]    CAASA's efforts to enforce the promissory notes in the District Court Case and foreclose on the deeds of trust precipitated de Groote's Bankruptcy Case. On May 15, 2002, CAASA was scheduled to conduct a non-judicial foreclosure on the Georgetown Townhouse. CAASA had reached this position after successfully overcoming de Groote's two attempts (November 13, 2001, and April 5, 2002) to obtain injunctive relief in the District Court. The day before CAASA's foreclosure sale was to occur, de Groote filed his petition commencing the Bankruptcy Case to get the benefit of the automatic stay.

contested in the nine years before trial.  He affirmatively conceded the issue countless times

before the case was commenced, in his pleadings in response to CAASA's complaint, and on

other occasions during the case prior to trial.  As will be seen, because de Groote never disclosed

the issue until trial, CAASA never had reason to broaden its complaint beyond the single claim it

alleged and actually litigated, never had reason to join an additional party plaintiff, never had

reason to explore the hidden issue in pre-trial discovery, and lacked any chance to address the

issue in its case-in-chief at trial before being ambushed with the issue after CAASA rested.

These considerations are directly relevant to the *res judicata* effect of the District

Court's judgment against CAASA.  The Bankruptcy Court either overlooked these

considerations, got them wrong, or misapplied applicable law.

## B.    THE ORIGINS OF THE CAASA-DE GROOTE DISPUTE

Between 1994 and 1998, Alain Aboudaram (CAASA's principal owner) advanced

money — hundreds of thousands of dollars worth — to pay de Groote's mortgage on the

Georgetown Townhouse.  In May 1995, de Groote agreed to repay Aboudaram's advances, but

not to Aboudaram.  He agreed to repay the advances to CAASA.[5]  The 1995 arrangement

relieved de Groote of having to make regular mortgage payments on the Georgetown Townhouse

for the next three years through May 15, 1998.[6]

-----------------------

[5]    Written evidence of de Groote's agreement to repay CAASA begins with de
Groote's May 24, 1995, letter addressed jointly to Aboudaram and CAASA and beginning
"Gentlemen."  In the letter de Groote acknowledged Aboudaram's prior and forthcoming
advances, agreed to execute a note evidencing his obligation to repay on demand all mortgage
advances made on his behalf, and further agreed to give a second mortgage on the Georgetown
Townhouse to secure repayment of the note.  Ex. 3.

[6]    Exs. 2 & 2A.

On December 20, 1995, in fulfillment of the foregoing agreement, de Groote executed a demand note payable to CAASA and gave CAASA a second deed of trust on the Georgetown Townhouse.[7]  Under the terms of the note, de Groote as "Borrower" promised to pay CAASA as "Lender," on demand, "the principal sum of $400,000 or, if less, the aggregate principal amount of all advances made hereunder by the Lender to the Borrower (including advances made prior to the date hereof), outstanding at the time of such demand," together with interest at regular and penalty rates defined in the note.[8]

At trial in the District Court Case, Aboudaram testified that the note was made payable to CAASA so that Aboudaram would not himself have to sue de Groote should repayment ever have to be enforced.[9]  At trial, de Groote admitted Aboudaram advanced the money,[10] admitted that he signed the notes payable to CAASA,[11] and admitted that he gave the agreed mortgage to CAASA.[12]  He also admitted he has not repaid the money.[13]

The notes expressly incorporated by reference "the grid attached hereto which is part of this Demand Promissory Note."  The grid was for recording advances and payments under the notes.  A copy of the grid attached to the 1995 note recorded $252,423.35 of advances

---

[7]      Proof of Claim, Exs. 1 & 2.

[8]      The note also named de Groote's wife as "Borrower," but she was never required to sign the note.

[9]      Dist. Ct. Trial Transcript at 47, 52, 69 (02/23/04).

[10]     Dist. Ct. Trial Transcript at 14-15, 17-19 (02/24/04).

[11]     Dist. Ct. Trial Transcript at 13, 17 (02/24/04).

[12]     Dist. Ct. Trial Transcript at 23 (02/24/04).

[13]     Dist. Ct. Trial Transcript at 19 (02/24/04).

8

already made before the date of the 1995 note.[14]  Those advances, like all others subsequently

made under the note, were made by Aboudaram.[15]

By May 1997, advances together with accrued interest had reached the $400,000

limit of the 1995 note.  On May 22, 1997, therefore, CAASA's counsel wrote to de Groote

informing him that, as of May 1, 1997, "the loan made to you by [CAASA]" amounted to

$401,387.79 (principal and interest) and demanding repayment.[16]  De Groote repeatedly

promised to repay but failed to do so.[17]  He never contested his obligation to repay CAASA as

"Lender" under the notes for the value he had received from Aboudaram.

In reliance on de Groote's presumed good faith, Aboudaram continued to make

advances through May 15, 1998.  These carried the unpaid principal and accrued interest

amounts under the first note to $495,000, well over the note's face amount of $400,000.[18]  On

October 13, 1998, therefore, de Groote gave CAASA a second promissory note having terms

identical to the first note (except for a $100,000 face amount) and gave CAASA a third deed of

trust on the Georgetown Townhouse.[19]  The total principal advances under the two notes were

$396,357.59 (including legal fees of $11,655.68 advanced for preparation of the loan and

---

[14]    Ex. 37

[15]    Dist. Ct. Trial Transcript at 45-47, 56-57, 64 (02/23/04).

[16]    Ex. 4.

[17]    Exs. 5, 6, 7, 17, 23, 25, 28; Dist. Ct. Trial Transcript at 162 (02/26/04).

[18]    *See* Ex. 1.

[19]    *See* Proof of Claim, Exs. 3 & 4.

9

security documents).[20]

      During 1999, de Groote continued to make promises to repay in response to CAASA's repeated demands.[21]  The promises proved to be empty, but they nonetheless induced CAASA to forbear from suing.  All of CAASA's and de Groote's exchanges reflect de Groote's acceptance that he owed money to CAASA under the notes in repayment of Aboudaram's mortgage advances.[22]  Indeed, on several occasions, de Groote made express promises to pay CAASA his debt under the notes.[23]

      As of September 11, 2000, despite CAASA's warnings of impending legal action to enforce the notes, de Groote had still paid nothing.  That day, Aboudaram and another CAASA representative met with de Groote in Washington to try once more to work out a resolution of de Groote's default.  At the meeting, de Groote again acknowledged his default under the notes but attempted for the first time (three years after CAASA's first demand for payment) to shift the focus away from his failure to repay by questioning whether CAASA had paid him in full for his consulting work for the company between 1992 and 1995.[24]

      On October 4, 2000, CAASA's U.S. counsel advised de Groote that he owed

---

[20]    Ex. 2A.

[21]    Dist. Ct. Trial Transcript at 162 (02/26/04).

[22]    *See* Exs. 5-15.

[23]    *See, e.g.,* Exs. 6 & 12.

[24]    Ex. 17; Dist. Ct. Trial Transcript at 165-66 (02/26/04).  For his consulting services, CAASA paid de Groote (or paid third parties for his benefit) 1,611,537.85 Swiss francs (approximately $1.4 million).  This compensation for services was entirely separate from de Groote's borrowings, most of which were from Aboudaram under the notes and a small amount of which (about $31,000 excluding interest) were from CAASA, but not under the notes.

10

$597,355.02 to CAASA under the notes and demanded repayment in full by October 12, 2000, failing which CAASA would sue for repayment.[25]  De Groote replied directly to Aboudaram on October 9, 2000.  Recalling the September 11, 2000, meeting with CAASA's representatives in Washington, de Groote <u>again</u> acknowledged his indebtedness to CAASA under the notes while also acknowledging the correctness of the amount demanded by CAASA's counsel.[26]

CAASA's threat of a lawsuit provoked a partial repayment.  After three and half years of broken promises, de Groote finally made his first repayment to CAASA ($40,000) on October 16, 2000.[27]  Between October 18 and December 8, 2000, CAASA and de Groote exchanged 15 more letters, and de Groote paid another $50,000 to CAASA (though he had promised to pay $250,000).[28]  As before, de Groote's exchanges with CAASA were completely devoid of any dispute that the notes encompassed Aboudaram's advances, and de Groote <u>again</u> expressly admitted his debt to CAASA under the notes.[29]  CAASA's and de Groote's dialogue ceased after December 8, 2000.

On December 22, 2000, de Groote made a final (unannounced) payment of $100,000 to CAASA, which CAASA did not discover until January 3, 2001.[30]  In total, de

---

[25]     Ex. 16.

[26]     Ex. 17.

[27]     Exs. 18 & 1.

[28]     *See* Exs. 1, 18-32.

[29]     *E.g.*, Ex. 23.

[30]     Ex. 33.

11

Groote paid $190,000 against CAASA's demands under the notes.[31]  In the long course of

CAASA's pre-lawsuit efforts to collect the notes, de Groote <u>never</u> contested that CAASA had

advanced funds under the notes, or that he had incurred a sizable debt under the notes that he was

obliged to repay to CAASA, or that the notes encompassed Aboudaram's advances.

## C.    THE DISTRICT COURT PLEADINGS

CAASA sued de Groote on January 3, 2001.  CAASA's single-count District

Court complaint alleged de Groote's breach of the two demand promissory notes and claimed

damages for de Groote's failure to repay principal, accrued interest, and CAASA's costs of

enforcement due under the two notes.  The only theory of recovery alleged in the complaint was

breach of the promissory notes.  The only plaintiff named was CAASA.

After initially defaulting, de Groote eventually answered the complaint with 20

offsetting counterclaims and affirmative defenses.[32]  None of them contested CAASA's status as

plaintiff, none contested that CAASA had made advances for de Groote's benefit under the

notes, and none relied on any language of the notes or other factor intrinsic to the notes as a basis

for relief.

Instead, all of de Groote's numerous defenses and counterclaims rested to one

extent or another on an allegation extrinsic to the notes, namely, that CAASA had agreed to share

with de Groote one-third of a fee CAASA earned from its client Skodaexport Company, Ltd.

---

[31]     Ex. 1.

[32]     Def.'s Verified Ans. & Countercl. & First Amended Verified Ans. & Countercl., *Conseil Alain Aboudaram, S.A. v. de Groote*, Case No. 1:01-CV-00006 (JDB) (D.D.C. filed Apr. 11 & May 23, 2001) (Dist. Ct. Docket #s 13 & 18) (Pl.'s Ex. II-30-B).  Hereinafter, all references will be to de Groote's First Amended Verified Answer and Counterclaims ("Answer" or "Countercl.").

Based on the alleged commission-sharing agreement, de Groote's counterclaims alleged breach

of the agreement, fraud in the inducement of the notes, and various other offsetting claims (all

extrinsic to the notes).

De Groote's chief pleading, his Verified Answer and Counterclaims, contained no

less than 13 affirmative admissions that CAASA advanced funds under the notes.[33]  As to the

1995 note, for example, he admitted:

> Beginning in 1994 and continuing into 1996, Plaintiff [CAASA]
> began making advances to Defendant de Groote . . . [and] . . . in
> December 1995, [Aboudaram] . . . pressured de Groote to sign a
> Promissory Note securing the advances made by [CAASA] to de
> Groote . . ..[34]

He made the same admission as to the 1998 note.[35]

Throughout his pleading, de Groote repeatedly and consistently admitted that

CAASA was the source of the advances evidenced by the notes.[36]  De Groote also admitted that

he signed "notes to secure previously undocumented and unsecured advances,"[37] expressly

---

[33]    Countercl. ¶¶ 49, 51, 55, 72-73, 76-78, 89, 103, 105, 114 & 124.

[34]    Countercl. ¶¶ 49 & 51 (emphasis added).  In the cumbersome (but clear)
definitional scheme of de Groote's pleading, Aboudaram (the individual) is defined as "Counseil
Alain Aboudaram, principal of Plaintiff/Counter-Defendant," and CAASA (the entity) is defined
as "Plaintiff or Aboudaram."  Thus, in de Groote's definitional scheme, "Counseil Alain
Aboudaram" is the individual, and "Aboudaram" is the entity.  Id. ¶ 41.

[35]    Countercl. ¶ 55.

[36]    See Countercl. ¶¶ 78, 89, 103, 105, 114, & 124.

[37]    Countercl. ¶ 72.

describing the notes as evidencing advances from <u>CAASA</u> that had <u>already</u> been made.[38]  These admissions unquestionably referred to advances made by Aboudaram personally and acknowledged the advances as having been made under the notes.  De Groote's pleading admissions are highly significant in view of de Groote's knowledge from the very beginning that the funds in question had actually been advanced by Aboudaram personally.

De Groote's answer raised the affirmative defense of payment,[39] but his answer to CAASA's contention interrogatory No. 2 revealed that the defense did not assert (as he later did at trial) that CAASA's advances under the notes had been fully repaid.[40]  Rather, de Groote contended he was owed more by CAASA than he owed CAASA under the notes, and that by being CAASA's net creditor he had thereby paid his obligation to CAASA under the notes.  He made no claim that CAASA did not make the advances referenced in the promissory notes.  Nor did he dispute the connection between Aboudaram's advances and the notes.  De Groote never amended or supplemented this interrogatory answer.

## D.     THE PRE-TRIAL RECORD

The pre-trial record contains numerous additional concessions by de Groote that the notes encompassed Aboudaram's advances.  In opposing CAASA's pre-trial motion for summary judgment, for example, de Groote disputed the precise amount of CAASA's advances, but made no issue about whether CAASA had advanced the funds it sought to recover under the

---

[38]     *See also* Countercl. ¶¶ 73, 76 & 77 (describing the promissory notes as securing advances or repayment of advances).

[39]     Answer ¶ 27 (Pl.'s Ex. II-30-B).

[40]     *See* Answers of Defendant Jacques de Groote to Pl.'s First Set of Interrogs., Answer No. 2 (Sept. 12, 2001) (Pl.'s Ex. II-29).

14

notes.[41]

His position was the same when he sought injunctive relief to block CAASA's foreclosure on the Georgetown Townhouse.[42]  The trial court's May 2, 2002, memorandum opinion denying de Groote's injunction request parsed de Groote's defenses to CAASA's non-judicial foreclosure action, including his various defenses to liability under the notes.  Notably absent was any dispute about whether the notes encompassed Aboudaram's advances.[43]

De Groote's position was no different when he testified for two days at deposition in October 2001.  At deposition, de Groote admitted no less than 33 times that:  Aboudaram's advances were (in de Groote's words) "consolidated in," "secured by," "incorporated in," and drew on a "credit line" reflected in the promissory notes; that the May 24, 1995, letter agreement obligated de Groote to "execute and deliver . . . a mortgage note evidencing my obligation to pay you [*i.e.,* CAASA or Aboudaram] on demand" the amounts both Aboudaram <u>and</u> CAASA advanced in payment of de Groote's mortgage; Aboudaram had explained to de Groote that Aboudaram's "personal advances to pay my mortgage . . . has to be part and parcel of the first promissory note"; and de Groote "accepted then that this [Aboudaram's personal advances to pay

---

[41]    *Compare* Pl.'s Stmt. of Mat. Facts Not in Dispute (Mar. 15, 2002) (Dist. Ct. Docket # 48) at 9, ¶ 43 *with* Def.'s Stmt. of Mat. Facts in Dispute (Apr. 4, 2002) (Dist. Ct. Docket # 54) at 16, ¶ 61.  De Groote's comment at the end of ¶ 61 that CAASA would have to prove the amounts advanced made sense in light of the character of the notes as running account notes.  This, however, in no way contradicted de Groote's earlier admission in ¶ 61 that CAASA (not Aboudaram) was the source of advances "covered by the note."

[42]    Ex. B1 to Def.'s Supp. Mem. of P. & A. in Support of Def.'s Renewed Mot. for a T.R.O. & P.I. (Apr. 5, 2002) (Dist. Ct. Docket # 57).

[43]    Memorandum Opinion at 10-11, *Conseil Alain Aboudaram, S.A. v. de Groote*, Case No. 1:01-CV-00006 (JDB) (D.D.C. May 2, 2002) (Dist. Ct. Docket # 67).

de Groote's mortgage] would be incorporated in my promissory note".[44]

The District Court Case was vigorously litigated for three years before trial. If de Groote genuinely contested whether the notes encompassed Aboudaram's advances, he had numerous opportunities before trial to say so. But he never did: not in his motion to vacate his default;[45] not in his lengthy verified answer and counterclaims (or his amendments thereto);[46] not in his two motions for injunctive relief;[47] not in two full days of his deposition testimony;[48] not in his interrogatory answers;[49] not in his sworn affidavits filed on various pre-trial motions over the course of three years;[50] not in his pre-trial statement filed 25 days before the commencement of the trial;[51] and not in his counsel's presentation at the lengthy pre-trial conference 15 days before

[44]    *See* Ex. A to Declaration of James L. Marketos In Further Support of CAASA's Motion to Alter or, in the Alternative, to Obtain Relief from Order Granting de Groote's Motion for Judgment as a Matter of Law (July 16, 2004) (Dist. Ct. Docket # 170) ("Marketos Reply Dec.") (*See, e.g.,* Deposition Admission Nos. 3, 4, 19, 21, 24, 25, 27, 30).

[45]    Dec. of Jacques de Groote in Supp. of Def.'s Mot. to Vacate Default ¶ 22 (Apr. 2, 2001) (Docket # 9).

[46]    Pl.'s Ex. II-30-B (Answer & Countercl.).

[47]    Def.'s Mot. for T.R.O. & P.I. (Nov. 13, 2001) (Docket #s 30 & 31); Def.'s Supp. Mem. of P. & A. in Supp. of Def.'s Renewed Mot. for T.R.O. & P.I. (Apr. 5, 2002) (Docket # 57).

[48]    *See* Ex. A to Marketos Reply Dec..

[49]    Answers of Defendant Jacques de Groote to Pl.'s First Set of Interrogs., Answer No. 2 (Sept. 12, 2001) (Pl.'s Ex. II-29).

[50]    For example, de Groote's lengthy and detailed affidavit in support of his November 2001 (and first) request for injunctive relief failed to mention any defense intrinsic to the notes and instead consistently acknowledged that "CAASA" had made advances under the notes. *See* Aff. of Jacques de Groote in Supp. of T.R.O. ¶ 6.2(c) (Nov. 13, 2001) (Docket #s 30 & 31).

[51]    *See* Jt. Pretrial Stmt. §§ I-B, II-B & III-A (Jan. 26, 2004) (Docket # 91).

the trial.[52]  Nor did he move for summary judgment on the issue, as he could have done at any

time after the filing of the complaint.

Discovery in the District Court Case took the form of document productions,

answers to interrogatories, and depositions.  Because de Groote never contested that CAASA

made advances under the notes (and in fact affirmatively and repeatedly admitted in his pleading

and elsewhere that CAASA had advanced funds under the notes), CAASA never had reason to

take discovery on the issue.  Likewise, because de Groote never disputed his liability to CAASA

under the notes except on extrinsic grounds, CAASA never had reason to explore in discovery

any claim theories alternative to breach of the promissory notes, never had reason to explore facts

supporting defenses intrinsic to the notes, and never had reason to consider the need to join

additional claims or parties (particularly Aboudaram).  This is simply because de Groote never

raised as a defense that CAASA had not made advances under the notes.

E.    THE DISTRICT COURT TRIAL

After three years of vigorous pre-trial litigation (mostly over de Groote's

counterclaims and defenses), the case was tried to a nine-member jury for eight days

commencing February 20, 2004.  Weeks prior to trial CAASA had asked de Groote to stipulate

to the amount of CAASA's 38 individual advances under the notes, which he had never

contested.  He did not finally give the stipulation until literally the eve of the presentation of

evidence at trial (February 22, 2004).  At about 11:00 p.m. that evening (a Sunday), de Groote

stipulated that "[a]ll payments listed in the attached Joint Stipulated Exhibit 2, titled "Amounts

Paid to de Groote (1994-1998)," were payments to de Groote in the amounts stated and were

---

[52]    Tr. of Pretrial Conf. (Feb. 5, 2004).

17

received by de Groote."[53]  By that time, the trial had already begun.[54]

As the price for his eleventh-hour stipulation, he insisted on a non-stipulation, specifically, that the parties did not stipulate "that the legal fees shown on Joint Stipulated Exhibit 2 were payments to or for the benefit of de Groote, or that the payments shown on Joint Stipulated Exhibit 2 were payments made by CAASA or were payments under the notes at issue in this case."[55]  This was the first hint that de Groote questioned whether CAASA made advances under the notes.  Still, he did not reveal any basis for his untimely disclaimer.  And CAASA did not realize that de Groote's last-minute insistence on language of non-stipulation was the precursor to an ambush to be sprung at trial.

During CAASA's case-in-chief de Groote greased the skids for his ambush with an innocuous-sounding evidentiary objection.  When CAASA first offered the promissory notes into evidence, de Groote objected to the grids being attached.  The stated basis for his objection was lack of authenticity:  two of the entries on one of the grids post-dated the note in question and therefore could not have been present when the note was signed.  Thinking de Groote's authenticity objection was innocuous and that the grids were dispensable in light of de Groote's

---

[53]      Ex. 2.  After weeks of hedging (even though he did not substantively dispute any of the 38 advances listed on CAASA's proposed trial stipulation) and after threatening to reject the entire stipulation if CAASA would not change the title and add stipulation text de Groote demanded, he finally agreed to Trial Stipulation No. 2 a few minutes before midnight on the evening of Sunday, February 22, 2004.  CAASA opened its case-in-chief the next morning. Declaration of James L. Marketos in Support of CAASA's Motion to Alter or, in the Alternative, to Obtain Relief from Order Granting de Groote's Motion for Judgment as a Matter of Law ¶¶ 18-42 (June 22, 2004) (Docket # 163) ("Marketos Dec.").

[54]      The trial started the preceding Friday (February 20, 2004), with jury selection and opening statements.

[55]      Ex. 2.

stipulation to the amounts advanced, CAASA consented to detaching the grids so that the notes could be admitted without objection.[56]

De Groote's ambush came immediately after CAASA rested on its case-in-chief (February 24, 2004), when de Groote moved under Fed. R. Civ. P. 50(a) for judgment as a matter of law. His grounds for judgment — raised for the very first time in the entire case — were intrinsic to the notes. Citing the provision in each note casting de Groote's repayment obligation as an obligation to repay "all advances made hereunder by Lender" (defined as CAASA), de Groote argued that the strict language of the notes obliged him to repay only advances made by CAASA. The undisputed trial evidence, he argued, showed that he had fully repaid the relatively small loans stipulated to have been made by CAASA beginning in 1998.[57] The advances CAASA sought to recover, he argued, were Aboudaram's advances between 1994 and 1998, not

---

[56]    Dist. Ct. Trial Transcript at 53-54 (02/23/04); *see* Marketos Dec. ¶¶ 9-10. Technically, de Groote had already waived his authenticity objection, as he had failed to serve or file any written objection to CAASA's list of trial exhibits contained in the pre-trial statement. *See* Fed. R. Civ. P. 26(a)(3)(C)(ii). But de Groote's pre-existing waiver was overlooked both by the trial court and by CAASA. Furthermore, inasmuch as the notes expressly contemplated that subsequent notations would be made on the grids, the notes with grids attached were in fact authentic and were properly admissible as the complete notes. *See* Fed. R. Evid. 106.

[57]    *See* Dist. Ct. Trial Transcript at 63, 71-72 (02/24/04). At trial, de Groote relied on Trial Stipulation No. 3 to support the untenable position that his <u>unsecured</u> borrowings from CAASA in <u>1998</u> (about 47,000 Swiss francs = about $31,000 at then prevailing exchange rates), were borrowings under the <u>secured</u> promissory notes (the first of which he had given in <u>1995</u>), and that by repaying these unsecured borrowings he repaid <u>all</u> advances CAASA had <u>ever</u> made under the promissory notes, which on their face covered a potential indebtedness of up to $500,000. Dist. Ct. Trial Transcript at 57-59 (02/24/04). The verdict in CAASA's favor establishes that the jury did not accept de Groote's testimony that he had repaid all loans CAASA had ever made to him. Significantly, de Groote's repayment of CAASA's unsecured 1998 loans on April 6, 2000, was <u>not</u> part of the $190,000 he paid CAASA in October-December 2000 in response to CAASA's demands for repayment of the notes. *See* Ex. 1; Pl.'s First Amended Compl. for Compensatory Damages at ¶¶ 13-14 (July 9, 2001) (Docket # 53) (Pl.'s Ex. II-46); Answer at ¶¶ 13-14 (Pl.'s Ex. II-30-B).

CAASA's.[58]  As the notes were clear and unambiguous, his argument continued, New York law

(which governs the notes) strictly prohibited the consideration of extrinsic evidence that

Aboudaram's advances had been made under the notes.  Accordingly, the argument concluded,

CAASA had failed to prove an essential element of its *prima facie* case and de Groote was

therefore entitled to judgment.[59]

Desperate to find a way around de Groote's trial tactic, CAASA orally moved on

March 1, 2004 (during trial), to amend the complaint.  CAASA's motion sought to:  (1) add a

count for de Groote's breach of an oral promise to repay CAASA the amounts of Aboudaram's

advances; (2) add a count for breach of de Groote's breach of an oral promise to repay

Aboudaram the amounts of Aboudaram's advances; and (3) join Aboudaram as an additional

plaintiff.  De Groote opposed the motion, contending he would be prejudiced by such late

amendments and had not consented to trial of the new claims CAASA sought to introduce.  The

trial judge agreed with de Groote and denied CAASA's motion to amend.[60]

The trial judge submitted the case to the jury, postponing a decision on de

Groote's motion for judgment pending the verdict and the submission of post-trial briefs.  On

March 2, 2004, after a little more than two hours' deliberation, the jury rendered a unanimous

verdict awarding damages of $536,263.55 to CAASA for de Groote's non-payment of principal

and accrued interest due under the two promissory notes through February 23, 2004.  The jury

---

[58]     While disputing that he owed CAASA any money under the notes, de Groote
blithely admitted three times at trial that he owed money to Aboudaram.  Dist. Ct. Trial
Transcript at 16, 59 (02/24/04); Dist. Ct. Trial Transcript at 91 (02/27/04 p.m.).

[59]     *See* Dist. Ct. Trial Transcript at 65-85 (02/24/04).

[60]     *See* Dist. Ct. Trial Transcript at 9-20, 29, 126-144 (03/01/04).

also found for CAASA on all of de Groote's counterclaims and defenses submitted to the jury.[61]

De Groote thereupon renewed his motion for judgment pursuant to Fed. R. Civ. P. 50(b), and the

parties submitted additional post-trial briefs on the issues raised.

## F.     POST-TRIAL EVENTS

On March 8, 2004, CAASA again moved to amend the complaint, this time to

conform it to the evidence at trial (Dist. Ct. Docket # 141).  CAASA's motion sought:  (1) to add

a count for reformation of the promissory notes; and (2) entry of an order reforming the

promissory notes by changing the phrase "advances made hereunder by the Lender" to "advances

made hereunder by Alain Aboudaram."  De Groote opposed the motion, contending that:  (1)

there was no evidence of mutual mistake in the drafting of the promissory notes from which de

Groote's consent to trial of the reformation issue could be implied; (2) CAASA was dilatory in

seeking amendment and did so in bad faith; and (3) de Groote would be prejudiced because he

had not prepared a defense to a reformation claim and had no opportunity to cross-examine

CAASA's witnesses on the subject of mistake (Dist. Ct. Docket # 149).  Again the trial judge

agreed with de Groote and denied CAASA's motion to amend in an order and memorandum

entered June 7, 2004 (Dist. Ct. Docket #s 156 & 157).

The same order and memorandum granted de Groote's motion for judgment.  The

trial judge concluded that CAASA had failed to prove an essential element of its *prima facie*

case, namely, that CAASA (as opposed to Aboudaram) had loaned the funds it sought to recover

under the notes.  Specifically, the trial court refused to consider both intrinsic and extrinsic

---

[61]     *See* Dist. Ct. Trial Transcript 42, 50-54 (03/02/04); Verdict Form (District Court
Docket # 139).  All other counterclaims and defenses were dismissed by the trial judge in various
pre-trial and trial rulings.

evidence of the parties' understanding that Aboudaram's advances were recoverable under the notes. The trial court also failed to address CAASA's arguments that de Groote's motion for judgment should be denied on grounds of estoppel, modification by subsequent conduct, and waiver.

On June 22, 2004, CAASA moved for reconsideration of the order under Fed. R. Civ. P. 59(e) and 60(b) (Dist. Ct. Docket # 163). On August 31, 2004, the District Court denied CAASA's motion for reconsideration, entered judgment for de Groote on CAASA's claim, and entered judgment for CAASA on de Groote's counterclaims (Dist. Ct. Docket # 176). Again, the court failed to consider that de Groote should have been bound by his repeated, affirmative, and consistent concessions prior to trial that the notes encompassed Aboudaram's advances, and that these concessions obviated CAASA's need to prove that CAASA made advances under the notes.

Thus, de Groote defeated CAASA's promissory notes claim on the basis of an issue never raised before trial. And because CAASA could not overcome de Groote's trial ambush with pleading amendments, de Groote succeeded in keeping Aboudaram and three alternative claims (two by CAASA and one by Aboudaram) out of the District Court Case.

On September 29, 2004, CAASA timely filed a notice of appeal of the District Court's June 7 and August 31 orders ("D.C. Circuit Appeal") (Dist. Ct. Docket # 177). On September 30, 2004, de Groote timely appealed from the judgment dismissing his district court counterclaims (Dist. Ct. Docket # 178). CAASA's D.C. Circuit Appeal and de Groote's cross-appeal are pending with the briefing not yet completed.

## SUMMARY OF ARGUMENT

CAASA sued de Groote in the district court to enforce two demand promissory notes signed by de Groote.  In the face of nine years of de Groote's representations and conduct (including three years of sworn statements) conceding that his debt to CAASA's principal owner, Alain Aboudaram, was encompassed in and evidenced by the promissory notes, CAASA did not plead any alternative theories of recovery.  De Groote then surprised CAASA at trial and won on the basis of a defense never before revealed, namely, that the literal text of the promissory notes encompasses advances made by CAASA, not advances made by Aboudaram.

In response to the district court outcome, CAASA amended its proof of claim in the bankruptcy court by advancing eight alternative claim theories not pleaded in the district court but amply supported by the documentary and testimonial record adduced at trial.  The bankruptcy court held these alternative theories barred by the doctrine of *res judicata* and disallowed CAASA's claim in its entirety.

The bankruptcy court erred in determining that the alternative claim theories were part of the same transaction as the promissory notes, ignoring evidence of the parties' expectations and understanding that, to collect de Groote's debt, CAASA would only have to sue de Groote on the notes, not on any alternative theory (Argument Point I).

In light of the overwhelming evidence of de Groote's concessions to CAASA that he was liable under the promissory notes for Aboudaram's advances, the bankruptcy court also erred in holding that CAASA could have anticipated the need to plead alternative theories and that it would not have been impracticable for CAASA to have done so (Argument Point II).

The bankruptcy court also wrongly declined to consider CAASA's argument that

23

the judicially created exception to the application of *res judicata* for fraud and misconduct applied under the circumstances, erroneously determining that CAASA litigated that issue in the district court, which CAASA had not (Argument Point III).

Likewise, the bankruptcy court erroneously failed to consider CAASA's argument that it lacked constitutionally adequate notice, from de Groote's pleadings, of de Groote's textual defense to the notes. Here again, the bankruptcy court failed to appreciate that the district court's ruling did not preclude the bankruptcy court from considering whether de Groote's misconduct in the district court should estopp him from raising *res judicata* in the bankruptcy court (Argument Point IV).

Finally, the bankruptcy court erroneously declined to follow the logic of caselaw from other jurisdictions holding that a party that successfully objects to his adversary's attempt to add additional claim theories at the trial of the first action is estopped from pleading *res judicata* to bar additional theories in the second action. This exception is perfectly consistent with, and is indeed recognized by, the Restatement's test for invoking *res judicata* (Argument Point V).

## **ARGUMENT**

### I.    THE BANKRUPTCY COURT ERRED IN DEEMING CAASA's ALTERNATIVE CLAIM THEORIES TO BE PART OF THE SAME CAUSE OF ACTION AS CAASA's PROMISSORY NOTES CLAIM.

The Bankruptcy Court's summary judgment ruling deemed CAASA's Alternative Claim Theories to be barred by *res judicata* because they were part of the same cause of action as CAASA's promissory notes claim. The court deemed CAASA merely to be "simply raising a new legal theory" (Disallowance Decision at 10 (quoting *Apotex, Inc. v. Food & Drug Admin.*,

24

393 F.3d 210, 217 (D.C. Cir. 2004)).  This ruling was a misapplication of applicable law.

The District of Columbia Circuit has adopted the Restatement test for determining whether two causes of action are the same.  The Restatement test considers whether treatment of the causes of action as a unit conforms to the parties' expectations or business understanding or usage:

> In addressing the cause-of-action question, the *Restatement* speaks in terms of a transaction or series of transactions and gives "weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and <u>whether their treatment as a unit conforms to the parties' expectations or business understanding or usage</u>."

*U.S. Industries, Inc. v. Blake Construction Co., Inc.*, 765 F.2d 195, 205 (D.C. Cir. 1985) (quoting RESTATEMENT (SECOND) OF JUDGMENTS § 24(2) (1982) (emphasis added)).  Thus, while *res judicata* prevents repetitious litigation of the same claims or issues, it is no bar when treating claims as a unit does not conform with the parties' expectations or frustrates common business understandings and usages.  The Bankruptcy Court misapplied the foregoing test by failing to apprehend that treating CAASA's Alternative Claim Theories and CAASA's promissory notes claim as a single unit drastically frustrated the parties' expectations and common business understandings and usages.

In evaluating the Restatement's definition of "transaction," Wright and Miller emphasize that the expectations of the parties are measured by what the parties expected at the time of the conduct underlying the action and at the time suit is filed:

> Repose is reasonably promoted by looking to the probable expectations of the parties both at the time of their underlying actions and at the time of suit, without undue risk of foreclosing valid claims.  Defendants may reasonably demand that disposition

25

> of the first suit establish repose as to all matters that ordinary
> people would intuitively count part of a single basic dispute, and
> plaintiffs should be able to comply with this standard.

18 CHARLES A. WRIGHT, ET AL., FEDERAL PRACTICE AND PROCEDURE § 4407 (2nd ed. 2002).

It is commonly understood that notes and deeds of trust are used as convenient written evidence of an underlying debt and the security therefor and are intended to provide summary judicial and non-judicial enforcement mechanisms, obviating the need for a complex, multi-count complaint embracing every conceivable contractual and quasi-contractual theory of recovery pertaining to the underlying debt. This is precisely how the parties understood and used the notes in this case.

The evidence is undisputed that from the time the notes were executed all the way until the close of CAASA's enforcement case-in-chief at trial, de Groote and CAASA plainly understood and expected that de Groote's liability to repay CAASA for the amounts advanced by Aboudaram was embodied in the promissory notes. Reflecting common business practice, the parties also expected that if "push ever came to shove" CAASA would sue de Groote under the notes or would effect non-judicial foreclosure on the Georgetown Townhouse under the deeds of trust to recover the value advanced by Aboudaram, and that if de Groote had any defenses intrinsic to the notes, he would raise them well before trial in the suit on the notes or in defense of the foreclosure. De Groote confounded those expectations and frustrated common business understandings and usages by concealing a defense intrinsic to the notes until trial. In such circumstances, CAASA's claim for money lent based on the promissory notes should not be treated as a unit with the other available grounds for the claim. CAASA's alternative grounds are therefore not barred by *res judicata.*

26

De Groote's understanding and expectation that CAASA would not plead alternative theories of recovery in its complaint is reflected in his verified counterclaim admissions, his sworn answer to CAASA's interrogatory no. 2, his motions for injunctive relief, his sworn deposition testimony, and his various pre-suit letters to CAASA.  In <u>none</u> of these important documents did he <u>ever</u> point to a defect intrinsic to the notes.

Moreover, after reversing field at trial and contesting his liability under the notes on an intrinsic ground, de Groote all but conceded that he had no interest in or expectation for repose when he testified that "I still have a debt in fact to Mr. Aboudaram to some extent, legally speaking . . . ."[62]  In effect, de Groote was attempting to avoid liability under the notes on a technicality while admitting he still remained liable on the underlying debt.

In the District Court Case, de Groote waited so late to raise his previously undisclosed textual defense that he not only demolished the parties' nine-year-old expectations, but he also successfully blocked CAASA, to its manifest prejudice, from amending its complaint to include alternative theories of recovery.  In these circumstances, the Bankruptcy Court's ruling violated two important precepts that, according to the Restatement, underlie the *res judicata* doctrine.

First, the Bankruptcy Court's ruling undermined the overarching public policy that repose should reflect the expectations of the parties.  *See* RESTATEMENT (SECOND) OF JUDGMENTS § 24(2) (1982) ("What factual grouping constitutes a 'transaction', and what groupings constitute a 'series', are to be determined pragmatically, giving weight to such

---

[62]    *See* Ex. 36 [Trial Transcript (Feb. 27, 2004) at 91] ("Well, I owed a debt to Mr. Aboudaram.   . . . [A]nd I still have a debt in fact to Mr. Aboudaram to some extent, legally speaking . . ..")).

considerations as whether . . . treatment [of facts] as a unit conforms to the parties' expectations

or business understanding or usage."). Here, as seen, for a full nine years before trial the parties

looked only to the notes as the expression of de Groote's debt and CAASA's claim. Until trial,

CAASA never expected that if it ever had to sue to collect, it would have to do so on grounds

other than the notes. If de Groote had a different expectation, he never said so before trial. By

extending the *res judicata* bar to CAASA's Alternative Claim Theories, the Bankruptcy Court's

ruling squarely conflicts with the public policy that *res judicata* should be applied in a way that

reflects the expectations of the parties. Instead, the Bankruptcy Court should have confined the

*res judicata* bar to the breach of promissory notes theory actually litigated in the District Court

Case and allowed the Alternative Claim Theories to proceed.[63]

       Second, the Bankruptcy Court ruling contravenes the basic assumption that the

flexibility of pleading and amendment embodied in the Federal Rules of Civil Procedure justify

and effectively counterbalance the otherwise harsh consequences of the Restatement's expansive

definition of a transaction or series of transactions. *See* RESTATEMENT (SECOND) OF JUDGMENTS

---

[63]     Lest there be any doubt, CAASA's breach of promissory notes theory was the only claim theory actually litigated in the District Court Case. This is reflected in the plain language of the District Court's judgment, which is expressly limited to CAASA's claim against de Groote <u>under the promissory notes</u>. *See, e.g.,* Order , *Conseil Alain Aboudaram, S.A. v. de Groote*, Case No. 1:01-CV-00006 (JDB) (D.D.C. June 7, 2004) (". . . it is further ORDERED that judgment is entered for de Groote on CAASA's claims *under the promissory notes*") (emphasis added) (Dist. Ct. Docket # 157). *See also* Memorandum Opinion at 19, *Conseil Alain Aboudaram, S.A. v. de Groote*, Case No. 1:01-CV-00006 (JDB) (D.D.C. June 7, 2004) (". . . the Court must enter judgment for de Groote on CAASA's claim for *breach of contract on the promissory notes*") (emphasis added) (Dist. Ct. Docket # 156); Memorandum and Order at 6, *Conseil Alain Aboudaram, S.A. v. de Groote*, Case No. 1:01-CV-00006 (JDB) (D.D.C. Aug. 31, 2004) ("Judgment is accordingly entered . . . for de Groote on CAASA's claims *on the promissory notes*.") (emphasis added) (Dist. Ct. Docket # 176).

§ 24 cmt. a (1982).[64]  The Bankruptcy Court's ruling threw the balance between the liberality of amendment and the harshness of *res judicata* totally out of whack.  Until trial, CAASA had no reason to file a complaint broader than the promissory notes or to amend the complaint beyond the single claim pleaded.  When the need finally arose — at trial in response to de Groote's motion for judgment — it was too late for amendment, and de Groote successfully blocked CAASA's two attempts to amend.  The Bankruptcy Court should have compensated for CAASA's inability to amend by treating CAASA's Alternative Claim Theories with greater leniency when assessing whether they were part of the "same basic dispute" that arose under the notes.  Given that the proof relating to CAASA's Alternative Claim Theories was distinctly different from the proof underlying CAASA's breach of notes theory, there were ample grounds to support such leniency.  The court's failure to make this compensation disturbed the balance intended to be struck between liberal amendment rights and the harsh *res judicata* rule and was another misapplication of the *res judicata* doctrine.  The Bankruptcy Court's summary judgment for de Groote should therefore be reversed.

---

[64]    Comment a provides in relevant part: "Equating claim with transaction, however, is justified only when the parties have ample procedural means for fully developing the entire transaction in the one action going to the merits to which the plaintiff is ordinarily confined.  A modern procedural system . . . permits considerable freedom of amendment and is willing to tolerate changes of direction in the course of litigation. . . .  Parties can resort to compulsory processes besides private investigations to ascertain the facts surrounding the transaction, thereby measurably avoiding surprise at the trial.  The pretrial conference contributes to the same end of developing the whole case.  The law of res judicata now reflects the expectation that parties who are given the capacity to present their 'entire controversies' shall in fact do so."

## II.    THE BANKRUPTCY COURT ERRED IN CONCLUDING THAT CAASA COULD HAVE ANTICIPATED de GROOTE's NEW INTRINSIC ISSUE.

The Bankruptcy Court's decision rests on the conclusion that CAASA could have anticipated the need to plead the Alternative Claim Theories when it filed the complaint or could have discerned the need during discovery.  According to the Bankruptcy Court, the need was apparent from the plain language of the notes, which were limited to CAASA's advances and therefore required de Groote's concession that the notes extended to Aboudaram's advances:

> CAASA's new claim theories asserted here could, as well, have been anticipated when it filed its action.  The promissory notes on their face were limited to amounts advanced by CAASA, and CAASA obviously needed a concession by de Groote or some other basis for having the notes extend to advances by Aboudaram.  Through discovery in the district court, CAASA should have been able to discover that de Groote was not willing to concede that the notes covered advances by Aboudaram, and could have sought then to amend the complaint.

(Disallowance Decision at 11).

The Bankruptcy Court was incorrect.  CAASA could not possibly have anticipated de Groote's trial position because, until trial, de Groote repeatedly made the very concession to which the Bankruptcy Court referred.  Countless times over nine years, de Groote conceded either that the notes encompassed Aboudaram's advances or that CAASA itself had made the advances in question.  During the three pre-trial years de Groote's concession was usually made under oath.  He conceded the point 13 times in his Amended Verified Answer and Counterclaims and 33 times in his deposition.  On every other occasion he addressed the issue his position was the same — until trial.

In the face of such a record, CAASA was entitled to rely on de Groote's

30

concession.[65]  It was not merely impracticable for CAASA to discover that de Groote would take a different position at trial, but it was utterly impossible.

Thus, the Bankruptcy Court was incorrect to conclude that "[t]hrough discovery in the district court, CAASA should have been able to discover that de Groote was not willing to concede that the notes covered advances by Aboudaram, and could have sought then to amend the complaint" (Disallowance Decision at 11), and that ". . . CAASA could have discovered de Groote's position through careful discovery . . . ." (*id.* at 13 n.4).  CAASA's failure to anticipate de Groote's about-face and amend the complaint was not anything CAASA could have discovered "through the exercise of ordinary due diligence" (Disallowance Decision at 12).  Indeed, de Groote's repeated pre-trial concessions gave CAASA every conceivable comfort that there was no issue that the notes encompassed Aboudaram's advances.  Thus, the need to advance the Alternative Claim Theories could not have been anticipated before trial.  They therefore should not have been barred by *res judicata.*

In concluding that CAASA was not immunized from the *res judicata* effect of claims it could have discovered through the exercise of ordinary due diligence, the Bankruptcy Court incorrectly relied on *Howe v. Vaughn (In re Howe)*, 913 F.2d 1138, 1147 (5th Cir. 1990) (Disallowance Decision at 11-12 & n.3).  *Howe* is distinguishable.  In *Howe*, parties seeking to pursue claims argued that, although they may have been aware of the basic facts underlying their claims, they were not aware of the significance of those facts.  Their ignorance was deemed no excuse for their failure to raise their claims in earlier proceedings.

---

[65]     CAASA's D.C. Circuit Appeal will determine whether, in the face of such a record and applicable law, it was error for the trial judge to require CAASA to prove as an element of its *prima facie* case that the notes encompassed Aboudaram's advances.

Distinguishing *Howe*, however, was that the Howes did not contend that the facts forming the basis of their claims were undiscoverable until after the earlier proceedings. *Id.* at 1147. CAASA asserts precisely what the Howes did not. In the face of de Groote's pre-trial record, no amount of pre-trial diligence on CAASA's part would have revealed that de Groote would change his longstanding position and contest at trial that the notes encompassed Aboudaram's advances. The Bankruptcy Court failed to apprehend this critical distinction, which led to the court's mis-reliance on *Howe*.

The Bankruptcy Court believed CAASA could have advanced its Alternative Claim Theories in the District Court Case if it had not consented to excluding the grids from the evidence at trial (Disallowance Decision at 10-11). But the Bankruptcy Court failed to account for how CAASA would have known to withhold its consent <u>before</u> de Groote announced his new position.[66]

The Bankruptcy Court also faulted CAASA for failing to assert in timely fashion a claim based on Aboudaram's assignment to CAASA (Disallowance Decision at 10-11). But in the face of de Groote's nine-year concession that the notes encompassed Aboudaram's advances, CAASA had no reason to plead and no burden to prove Aboudaram's assignment. Because de

---

[66] As CAASA showed in its motion for reconsideration in the District Court, it was tricked into consenting to the exclusion of the grids on the basis of a pretextual authenticity objection. When de Groote objected to the grids on authenticity grounds, CAASA did not know that he later planned to introduce a new intrinsic issue as to which the grids would prove helpful for CAASA. Therefore, believing the grids were dispensable as proof of the amounts advanced (to which de Groote had already stipulated), CAASA consented to their exclusion. At the time CAASA gave its consent it had no idea that the grids would later be needed, in the face of de Groote's new issue, to prove that the notes encompassed Aboudaram's advances. *See* CAASA's Motion to Alter Or, in the Alternative, to Obtain Relief from Order Granting De Groote's Motion for Judgment as a Matter of Law at 5, 10, 18-20 (June 22, 2004) (Dist. Ct. Docket # 163); *See also* Marketos Dec. ¶¶ 2-43.

Groote never disputed — until trial — that the notes encompassed Aboudaram's advances,

CAASA's complaint did not allege (or even mention) an assignment.  There was simply no issue

that the notes encompassed Aboudaram's advances.  De Groote's responsive pleading confirmed

this by conceding the point 13 times.  Thus, CAASA's failure to plead an assignment-based

claim was no basis for giving plenary *res judicata* effect to the District Court's judgment.


## III.    THE BANKRUPTCY COURT ERRED IN DECLINING TO APPLY THE *THROCKMORTON* EXCEPTION FOR FRAUD AND MISCONDUCT IN LITIGATION.

The Bankruptcy Court recognized, but declined to apply, the exception to the

general *res judicata* rule that arises in cases of fraud or misconduct (Disallowance Decision at

12-14).  Long ago the Supreme Court recognized the connection between claim preclusion and

misconduct on the part of the successful party in litigation.  In the context of fraud, *United States*

*v. Throckmorton* recognized a venerable exception to the general rule of claim preclusion when

the party sought to be barred was prevented by his adversary's conduct from presenting a real

contest on an issue at trial:

> But there is an admitted exception to this general rule in cases
> where, by reason of something done by the successful party to a
> suit, there was in fact no adversary trial or decision of the issue in
> the case.  Where the unsuccessful party has been prevented from
> exhibiting fully his case, by fraud or deception practised on him by
> his opponent, as by keeping him away from court, a false promise
> of a compromise; or where the defendant never had knowledge of
> the suit, being kept in ignorance by the acts of the plaintiff; or
> where an attorney fraudulently or without authority assumes to
> represent a party and connives at his defeat; or where the attorney
> regularly employed corruptly sells out his client's interest to the
> other side, — these, and similar cases which show that there has
> never been a real contest in the trial or hearing of the case, are

33

> reasons for which a new suit may be sustained to set aside and
> annul the former judgment or decree, and open the case for a new
> and fair hearing.

*United States v. Throckmorton*, 98 U.S. 61, 65-66 (1878) (Miller, J.).

The *Throckmorton* rule was articulated in the context of fraud and applies in the case of so-called "extrinsic" or "collateral" frauds (*i.e.*, frauds "extrinsic or collateral, to the matter tried by the first court, and not to a fraud in the matter on which the decree was rendered"). *Id.* at 68 (emphasis added). But Justice Miller's distinction between extrinsic and intrinsic frauds is nevertheless instructive. It establishes that *res judicata* is no bar if the successful party's misconduct precluded the adversary from knowing that a particular issue "would be a matter of inquiry at the trial," such that there was never a "real contest." *Id.* at 67.

Federal cases, including bankruptcy cases, continue to follow *Throckmorton. See, e.g., U.S. Industries, Inc. v. Blake Construction Co., Inc.*, 765 F.2d 195, 205 n.21 (D.C. Cir. 1985) ("Of course, nothing in the rule against splitting a cause of action prevents a plaintiff from later bringing claims that either could not have been anticipated when the first suit was filed or would have been utterly impracticable to join at that time."); *In re Lake*, 202 B.R. 751, 758 (Bankr. 9th Cir. 1996) (citing *Throckmorton* and stating: "The basic requirement for invoking the extrinsic fraud exception is that there has been no fair adversary trial at law, either because the aggrieved party was kept in ignorance of the action or proceeding, or in some other way fraudulently prevented from presenting his claim or defense."); *Harnett v. Billman*, 800 F.2d 1308, 1313 (4th Cir. 1986) ("An exception to the general principle that lack of knowledge will not avoid the application of res judicata rules is found in cases where fraud, concealment, or misrepresentation have caused the plaintiff to fail to include a claim in a former action.") (citing

34

RESTATEMENT (SECOND) OF JUDGMENTS § 26 cmt. j (1982)).[67]

The Supreme Court has held that there is no general equitable exception, based on "common sense and simple justice," to *res judicata* if the technical elements are present. *See Federated Dep't Stores v. Moitie*, 452 U.S. 394, 401 (1981). But *Moitie* did not overrule (and indeed did not even consider) the line of cases stemming from *Throckmorton*, which uphold an exception to *res judicata* where there is evidence that the judgment was procured through extrinsic fraud, misconduct, concealment, or misrepresentation. *See* 18 CHARLES A. WRIGHT, ET AL., FEDERAL PRACTICE AND PROCEDURE § 4415 (2nd ed. 2002) ("There is accordingly no reason to find in [*Moitie*] controlling precedent to defeat all possible exceptions.").

Where the "fault of the defendant" causes a plaintiff not to advance a claim, a subsequent suit on the claim left out of the first action is not barred by *res judicata* in a subsequent action; otherwise, the rule against splitting causes of action would produce unjust results:

> The rule [against splitting causes of action] presupposes the fact that the plaintiff is consciously acting inequitably in suing for only part of his claim, knowing that he was unnecessarily bringing vexatious lawsuits against the defendant or careless as to whether he was causing such vexation. The rule against splitting should not be so rigidly applied, however, to produce an injustice and thwart the policy upon which it was founded. Thus, where the plaintiff is ignorant of a possible cause of action which existed at the time of commencement of a prior, related action, and he is not negligent in

---

[67]     Comment j of the Restatement provides in relevant part: "So also when the plaintiff brings an action against the defendant for cancellation of a contract made between them, alleging that the plaintiff was mentally incompetent at the time of the making of the contract, and a verdict and judgment are given for the defendant, the plaintiff is not precluded from maintaining a second action for the cancellation of the contract on the ground of a misrepresentation the defendant concealed from the plaintiff at the time when the first action was brought."

> his ignorance <u>or his ignorance was caused by the fraud or fault of
> the defendant</u>, plaintiff's purpose in bringing the subsequent action
> will not be to consciously and unreasonably vex or harass the
> defendant. Rather, plaintiff's purpose will merely be to enforce the
> alleged liability upon the defendant. Consequently, the rationale
> and rule against splitting a cause of action will be inapplicable.

*Bolte v. AITS, Inc.*, 587 P.2d 810, 814 (Hawaii 1978) (emphasis added).

Litigants will not be permitted to profit from their misconduct by raising *res
judicata*: "Res judicata, however, does not shield a blameworthy defendant from the
consequences of his own misconduct. The rule against splitting causes of action serves no
purpose if a plaintiff cannot reasonably be expected to include all claims in the first action."
*McCarty v. First of Georgia Ins. Co.*, 713 F.2d 609, 612 (10th Cir. 1983). Thus, "where
plaintiff's omission of an item of his cause of action was brought about by defendant's fraud,
deception, or wrongful conduct, the former judgment has been held not to be a bar to suit." *Id.* at
613 (internal quotation marks and citation omitted); *see also Browning v. Levy*, 283 F.3d 761,
769-70 (6th Cir. 2002) (citing *McCarty* for proposition that wrongful concealment of material
facts that prevents assertion of claim in first action bars invocation of *res judicata*).

In the Bankruptcy Court's analysis, de Groote's litigation conduct did not trigger
the *Throckmorton* exception because "CAASA raised the same issues of alleged misconduct in
its motion for reconsideration, and the district court concluded that none of the issues mentioned
by CAASA . . . approach the 'clear error or manifest injustice' standard" (Disallowance Decision
at 13). In effect, the Bankruptcy Court deemed the trial judge's reconsideration decision to be
*res judicata* on the question of *res judicata*. This was obviously not the case, as the trial judge
had no occasion to consider the *res judicata* effect that his judgment would have in the

Bankruptcy Court. Thus, the Bankruptcy Court failed to consider that the same misconduct could be relevant to two different legal issues in two different forums at two different times.

In the District Court on CAASA's motion for reconsideration, de Groote's misconduct was relevant to whether the District Court should set aside its judgment under Fed. R. Civ. P. 59(e) and 60(b). In the Bankruptcy Court on de Groote's motion for summary judgment, de Groote's misconduct was separately relevant to whether the litigation misconduct exception limited the *res judicata* effect (in the Bankruptcy Court) of the District Court's judgment. The Bankruptcy Court was free to re-consider de Groote's misconduct in relation to the *res judicata* question, but failed to do so, incorrectly believing the issue of de Groote's misconduct was closed. Thus, CAASA was not taking "a second bite at that apple" (Disallowance Decision at 13) but, rather, was taking a bite out of a new and different apple. For these reasons, the Bankruptcy Court erred in refusing to consider de Groote's litigation misconduct as grounds for barring limiting the *res judicata* effect of the District Court judgment.

In its discussion of the *Throckmorton* exception to *res judicata*, CAASA cited *Hopewell Township Citizens I-95 Comm. v. Volpe*, 482 F.2d 376 (3rd Cir. 1973) for the proposition that *res judicata* will not bar litigation of an issue that was omitted from the prior action on the basis of the adverse party's representation to the court.[68] The Bankruptcy Court, however, failed to address this case and the important principal it stands for, namely, "that conduct in litigating the first case may estop the defendant from asserting claim preclusion, quite apart from consent or concealment." 18 CHARLES A. WRIGHT, ET AL., FEDERAL PRACTICE AND

_____

[68]    Opp. by Conseil Alain Aboudaram, S.A., To Debtor's Mot. for Summ. J. 30 (Dec. 3, 2004) (Bankr. Docket # 247).

PROCEDURE § 4415 (2nd ed. 2002).

The Bankruptcy Court did address, but distinguished, another case cited by

CAASA, *Doe v. Allied Signal, Inc.*, 895 F.2d 908 (7th Cir. 1993) (judgment in first action

obtained through defendant's reversal of pre-litigation representations was no *res judicata* bar in

subsequent lawsuit arising out of original representations).  The Bankruptcy Court distinguished

*Doe* because the two suits at issue in that case arose from different transactions, *i.e.*, different

cores of operative facts (Disallowance Decision at 13-14).  But the Bankruptcy Court overlooked

the main point of *Doe*, which is that a victory in the first action, secured through a cynical and

completely unanticipated change of position during litigation, constituted misconduct barring the

wrongdoer from invoking *res judicata* as a bar to alternative claims in a second action:

> Doe could not have learned about Allied's alleged fraud and breach
> before she filed the negligence suit for Allied told Doe repeatedly
> that she was an employee of Acme alone.  Only after Doe I was
> lodged did Allied assert that Doe was a joint employee of both
> companies.  No amount of diligence could have alerted Doe that
> Allied would turn around and admit that it had blatantly lied about
> her status over a period of years.  One could argue that the central
> fact pattern — Allied's statements to Doe from 1987 when it
> contracted with Acme until the time Doe filed Doe I — was
> completed before the first suit was lodged.  Yet a critical piece of
> the puzzle was Allied's change of tactics during the lawsuit.
> Without this information, Doe could not have known that she had a
> claim.

*Id.* at 914 (emphasis added).

The Bankruptcy Court distinguished *Doe* on another ground, namely, that Doe

suffered no damage from Allied's misrepresentations prior to the dismissal of her first action,

whereas CAASA's damages arose prior to the filing of the District Court complaint

(Disallowance Decision at 14).  Here again, the Bankruptcy Court failed to grasp that the relevant

38

inquiry for *res judicata* purposes is whether the claimant is deprived of an opportunity to assert a claim. In that context, CAASA (just like Doe) suffered no injury until the District Court dismissed the complaint three months after the trial. Thus, in both Doe's and CAASA's cases, the relevant misconduct prevented the litigants from timely asserting their second set of claims in the first suit. Accordingly, *Doe* supports CAASA's position that *res judicata* is no bar because it would allow de Groote to profit from his misconduct. For these several reasons, the Bankruptcy Court should have applied the *Throckmorton* exception and denied de Groote's motion for summary judgment.

IV.    **THE BANKRUPTCY COURT ERRED IN DETERMINING THAT CAASA HAD A FULL AND FAIR OPPORTUNITY IN THE DISTRICT COURT TO LITIGATE WHETHER IT RECEIVED CONSTITUTIONALLY ADEQUATE NOTICE OF de GROOTE's NEW ISSUE.**

        Just as the Bankruptcy Court failed to perceive that de Groote's litigation misconduct was independently relevant to the *Throckmorton* exception, so it also failed to perceive that CAASA's lack of adequate notice of de Groote's new intrinsic issue was independently relevant to whether de Groote should be estopped from invoking the bar of *res judicata*. In this connection, the Bankruptcy Court wrongly concluded that the District Court's rejection of CAASA's argument based on Fed. R. Civ. P. 8 also required rejection of CAASA's estoppel argument (Disallowance Decision at 14).

        In the District Court, CAASA argued that de Groote's failure to give notice of his intrinsic issue in his pleadings barred him as a matter of law under Rule 8 from raising the issue

at trial.[69]  In the Bankruptcy Court, CAASA argued that the same lack of notice estopped de

Groote from invoking *res judicata* as a matter of due process.[70]  CAASA's arguments in each

court were different and they were directed to two distinct legal issues.  Thus, the Bankruptcy

Court wrongly compared apples to oranges.

       Furthermore, the Bankruptcy Court's rejection of CAASA's argument was based

on the incorrect assumption that the District Court had formally determined that CAASA had a

full and fair opportunity to litigate the Alternative Claim Theories (Disallowance Order at 14).

The District Court made no such ruling.  The relevant District Court proceedings were CAASA's

two motions to amend the complaint (*see* Statement of Facts).  As the trial record shows,

CAASA did <u>not</u> raise any of the Alternative Claim Theories in that forum.[71]

       It is fundamental that *res judicata* does not bar litigation in a second action of

issues as to which the party sought to be barred lacked reasonable notice in the first action.  For

example, in *Smith v. United States*, 408 F.2d 448 (7th Cir. 1968), Smith filed a petition for the

return of money seized by the Government in a bank robbery investigation for which Smith was

never indicted.  In an earlier proceeding, the insurer of the robbed bank had successfully asserted

a claim to ownership of the money.  In response to Smith's petition, the Government pleaded *res*

---

[69]    CAASA's Reply Mem. on Mot. to Alter or Obtain Relief from J. at 6-8 (July 16, 2004) (Dist. Ct. Docket # 170).

[70]    Opp. by Conseil Alain Aboudaram, S.A., To Debtor's Mot. for Summ. J. 33-35 (Dec. 3, 2004) (Bankr. Docket # 247).

[71]    To be sure, CAASA's oral trial motion raised a breach of oral contract theory, and one of the Alternative Claim Theories is breach of express contract.  The express contract referenced in the Alternative Claim Theories, however, is a written contract, namely, the May 24, 1995, letter agreement between de Groote and CAASA/Aboudaram.

*judicata* to bar Smith's recovery of the money because Smith was allegedly served by certified mail in the first action, though he claimed he had no actual notice of the action. *Id.* at 449. The Seventh Circuit reversed the district court judgment granting the Government's motion for summary judgment on the ground of *res judicata* and remanded the case for further proceedings. Determining that the case involved the application of collateral estoppel, not *res judicata*, the Seventh Circuit nevertheless held that Smith lacked reasonable (and constitutionally required) notice of the insurance company's claim because he had not been served in accordance with Fed. R. Civ. P. 4. As a result, collateral estoppel would not bar Smith's litigation of his ownership claim in the second action. *See id.* at 449-50.

The Seventh Circuit in *Smith* relied on the Supreme Court's holding in *City of New York v. New York, New Haven & Hartford R.R. Co.*, 344 U.S. 293 (1953), that a creditor's claim in bankruptcy cannot be denied because it was filed after the bar date when the debtor failed to give the creditor constitutionally adequate notice of the order setting the bar date. Writing for the court, Justice Black noted that the "statutory command for notice embodies a basic principle of justice — that a reasonable opportunity to be heard must precede judicial denial of a party's claimed rights." *Id.* at 297.

Analogously, de Groote's District Court pleadings gave CAASA no notice that he intended to contest liability under the promissory notes on any intrinsic ground. The theory behind the notice pleading requirement of Rule 8 is that "a defendant's pleading should apprise the opponent of the allegations in the complaint that stand admitted and will not be in issue at trial and those that are contested and will require proof to be established to enable plaintiff to prevail." 5 CHARLES A. WRIGHT AND ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE

§ 1261 (2nd ed. 1990). So important is Rule 8's required notice of contested issues that a party's admission of his opponent's factual allegation at the pleading stage (*i.e.*, failure to give notice that such factual issue will be contested) binds him at trial and relieves the opponent of the duty to present evidence on that issue. *See Nat'l Ass'n of Life Underwriters, Inc. v. Comm'r*, 30 F.3d 1526, 1530 (D.C. Cir. 1994) (precluding IRS from contradicting in post-trial brief a fact admitted in answer, absent trial court's leave to amend, because adverse party presented no evidence of this fact at trial in reliance on admission).

Here, de Groote's Verified Answer and Counterclaims in 13 specific instances acknowledged that CAASA had advanced funds under the promissory notes, the very issue he contested for the first time three years later after CAASA rested at trial. Thus, not only did he fail to contest the issue; he affirmatively admitted it. As a matter of law, he thereby relieved CAASA of any obligation to present evidence on whether CAASA had made advances under the notes. Ignoring this fundamental pleading rule, the District Court deemed CAASA not to have proved its *prima facie* case.

By contrast, the Bankruptcy Court was not being asked to review, let alone reverse, the District Court's decision. Rather, CAASA asked the Bankruptcy Court to consider CAASA's lack of notice as a reason for rejecting *res judicata*. The District Court's decision was no bar to such consideration. Had the Bankruptcy Court considered CAASA's lack-of-notice argument in the *res judicata* context rather than rejecting it out of hand, the court would have limited the *res judicata* effect of the District Court's judgment to CAASA's breach of promissory notes claim and would not have disallowed CAASA's Alternative Claim Theories. Because the Bankruptcy Court improperly failed to consider CAASA's lack of notice in the *res judicata*

42

context, the summary judgment for de Groote should be reversed.

## V.    THE BANKRUPTCY COURT ERRONEOUSLY REJECTED THE PERSUASIVE LOGIC OF ESTOPPEL AUTHORITIES FROM OTHER JURISDICTIONS.

In opposing de Groote's motion for summary judgment, CAASA argued that because de Groote successfully blocked CAASA from amending its complaint to interpose any new claim theories, he was estopped from asserting *res judicata* to bar the Alternative Claim Theories.  For this argument CAASA relied on authorities from other jurisdictions, namely, *Lunsford v. Kosanke*, 295 P.2d 432 (Cal. Ct. App. 1956) (defendant's successful objection to admission of all evidence in plaintiff's case as outside scope of pleadings estopps defendant from asserting *res judicata* to bar second action pleading facts sought to be proved in first action), and *Sawyer v. First City Fin. Corp.*, 177 Cal. Rptr. 398 (Ct. App. 1981) (defendant's successful opposition to plaintiff's motion to consolidate for trial action A with action B estopps defendant from asserting *res judicata* to defeat action B after winning judgment in action A).

The Bankruptcy Court found *Lunsford* to be "plainly at odds with the doctrine of *res judicata* as applied by more recent decisions of the United States Court of Appeals for the District of Columbia Circuit discussed [earlier in the Disallowance Decision]" (Disallowance Decision at 15).  Presumably, the court was referring to *Drake v. Federal Aviation Admin.*, 291 F.3d 59, 66 (D.C. Cir. 2002), and *Apotex, Inc. v. Food & Drug Admin.*, 393 F.3d 210, 217 (D.C. Cir. 2004), which it cited as adhering to the Restatement (Second) of Judgments's approach to determining whether two or more claims are parts of the same cause of action (*see* Disallowance Decision at 9-10).  But there is nothing inconsistent with the D.C. Circuit's definition of the

43

general rule of *res judicata* and *Lunsford*'s recognition of an estoppel exception to invocation of the rule.

The Bankruptcy Court cited no authority establishing that the Restatement's transactional test abolished the extrinsic fraud exception to the general rule of *res judicata*. Indeed, the Restatement recognizes the extrinsic fraud exception. *See Harnett v. Billman*, 800 F.2d 1308, 1313 (4th Cir. 1986) ("An exception to the general principle that lack of knowledge will not avoid the application of res judicata rules is found in cases where fraud, concealment, or misrepresentation have caused the plaintiff to fail to include a claim in a former action.") (citing RESTATEMENT (SECOND) OF JUDGMENTS § 26 cmt. j (1982)). No D.C. Circuit authority has held to the contrary.

The Bankruptcy Court distinguished *Sawyer* because "there the defendant's successful opposition to the plaintiff's motion to consolidate for trial action A and action B was held, contrary to CAASA's assertion, **not** to have estopped the defendant from asserting *res judicata* to defeat action B after winning judgment in action A" (Disallowance Decision at 15 n.5) (emphasis in original). CAASA did not cite *Sawyer* as holding that estoppel was properly invoked in that case but, rather, for recognizing the estoppel exception to *res judicata*. *See Sawyer v. First City Fin. Corp.*, 177 Cal. Rptr. 398, 405 (Ct. App. 1981) (quoting *United Bank & Trust Co. v. Hunt*, 34 P.2d 1001 (Cal. 1934)). The point is that *Sawyer, Lunsford,* and *Hunt* persuasively support CAASA's argument that de Groote's successful blockage of new claim theories "was tantamount to an express determination on the part of the court with the consent of opposing counsel to reserve the issues involved for future adjudication." *See Hunt*, 34 P.2d at 1004.

44

Having successfully blocked CAASA's attempts during and after trial to introduce alternative theories of recovery, de Groote effectively conceded that CAASA had other claim theories that were not (and could not have been) litigated in the District Court. Under the foregoing authorities, de Groote should have been estopped from raising *res judicata* as a bar to any claim theory other than the one actually litigated in the District Court Case, namely, breach of the promissory notes. The Bankruptcy Court erred in rejecting persuasive estoppel authorities from other jurisdictions.

## CONCLUSION

For the several reasons set forth above, *res judicata* bars only the re-litigation of CAASA's promissory notes enforcement claim. *Res judicata* is no bar to CAASA's Alternative Claim Theories. De Groote was therefore not entitled to judgment as a matter of law on his motion for summary judgment. Accordingly, CAASA respectfully requests that the order granting de Groote's motion for summary judgment be reversed, and that this case be remanded to the Bankruptcy Court for the adjudication of CAASA's Alternative Claim Theories.

Dated: Washington, D.C.
        June 27, 2005

Respectfully submitted,

BERLINER, CORCORAN & ROWE, L.L.P.

Attorneys for Appellant
Conseil Alain Aboudaram, S.A.

By:    /s/ James L. Marketos
       James L. Marketos

45

D.C. Bar No. 412953
Alexander C. Vincent
    D.C. Bar No. 473459

1101 17th Street, N.W.
Suite 1100
Washington, D.C.  20036-4798
Telephone:  (202) 293-5555
Fax:  (202) 293-9035
E-mail:        jlm@bcr-dc.com
                  acv@bcr-dc.com